**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DANIEL THORNE, JR.,** *et al.,* | : | |
| | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:05-cv-0001** |
| | : | |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| **STEUBENVILLE POLICE OFFICER,** | : | **Magistrate Judge Abel** |
| **JOHN LELLES,** *et al.,* | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## OPINION & ORDER

## I. INTRODUCTION

This matter comes before the Court on the following motions: (1) Motion for Summary Judgment by the City of Steubenville, Ohio ("Steubenville" or "City"), Officer John Lelles ("Officer Lelles"), Officer Edward Karovic ("Officer Karovic"), Mayor Domineck Mucci, ("Mayor Mucci"), City Manager Bruce Williams ("City Manager Williams"), and Police Chief William McCafferty ("Chief McCafferty") (collectively, "Defendants"); and (2) Defendants' Motion to Strike Exhibits Submitted in Support of Plaintiffs' Responsive Brief in Opposition to Defendants' Motion for Summary Judgment.  For the reasons set forth herein, the Court **GRANTS** in part and **DENIES** in part Defendants' Motion for Summary Judgment and **GRANTS** Defendants' Motion to Strike.

## II. STATEMENT OF FACTS

-1-

## A. Background

In this 42 U.S.C. § 1983 action, Plaintiffs, Daniel "Danny" Thorne, Jr., and his parents, Mr. Daniel Thorne, Sr. and Mrs. Sharon Thorne (collectively, "Plaintiffs"), allege that Officers Lelles and Karovic, Steubenville police officers, violated Danny's Fourth Amendment rights when they seized him in his family's backyard, allegedly beat him with a Maglite flashlight, and arrested him for underage drinking.  The Plaintiffs' Complaint alleges the following facts.

### 1. The Arrest

On June 6, 2004, between 2:00 and 3:00 a.m., Officers Karovic and Lelles responded to a reported fight occurring at a party in the 300 block of Buena Vista in Steubenville.  Other officers were already on the scene, and Officer Pete Basil ("Officer Basil") directed Officers Karovic and Lelles to search for four male suspects who had fled on foot.  Officer Basil described one of the suspects as a white male wearing a red shirt.

After determining that the other officers did not need assistance at the scene of the party, Officers Karovic and Lelles began to search between the surrounding houses for the suspects. Officer Lelles observed evidence of footprints in the dew on the grass, and Officer Karovic heard voices coming from a nearby yard, which was blocked by an approximately six-foot-high wooden fence.  Officer Karovic then looked over the fence where he observed a white male in a red t-shirt talking on a mobile phone.[1]  The white male was Plaintiff, Daniel "Danny" Thorne, Jr. ("Danny"), and he was standing in the backyard of his family's home.

Officer Karovic claims that upon viewing Danny over the fence, he called for Danny to

---

[1]Officer Karovic testified that he cannot recall whether he had to "mount the fence," i.e. step on a rung, in order to see over into the Thornes' backyard.

come over, and identified himself as a police officer. He asserts, however, that Danny responded by ducking behind the deck of the Thornes' above-ground pool. Further, Officer Karovic testified that, though he repeatedly asked Danny to come out of hiding, Danny would not reveal himself and failed to respond to any of his repeated commands. Danny admits that he hid from Officer Karovic, but he denies that he heard either Officer Karovic or Officer Lelles identify themselves as police officers until after he hid under the deck.[2] Further, Danny claims that he hid underneath the deck because he did not know the two men who were in his backyard, and he was scared.

At that point, Officer Karovic circled around the pool and observed Danny "crawling underneath" the deck to the other side, close to the rear of the fence. Officer Karovic then circled the pool a second time, and Danny started to crawl back toward the house. Officer Karovic testified that he tried to grab Danny to stop him, but Danny evaded him. Officer Karovic claimed his "danger cues were up" because he did not know who Danny was, and did not know why he was avoiding the officers.

Danny then called his father, Daniel Thorne, Sr. ("Thorne, Sr.") on his mobile phone requesting help. Thorne, Sr. subsequently yelled out of the window of his house for Danny to get to the side door. Officer Karovic testified that at that time, he was able to grab Danny with a firm grip and take him to the side door of the Thorne house. Officer Karovic testified that it was his intent to seize Danny in furtherance of the investigation of the nearby disturbance. Danny testified that Officer Karovic did not make contact with him until they both reached the side door

---

[2]Danny also testified that he was accompanied by another young man named Vince Villone. Officers Karovic and Lelles testified that they did not see anyone else with Danny.

of the house.  Further, Danny testified that when he was running from under the deck to the side

door of the house, he observed for the first time that Officer Karovic was in uniform.  He claims,

however, that he does not recall either Officer Karovic or Officer Lelles saying anything to him

while he was running toward the house.

Danny asserts that while they waited for Thorne, Sr. to open the side door to the house,

Officer Karovic hit Danny three times above his right eye with an approximately eighteen or

twenty-inch Maglite flashlight.[3]  Officer Karovic denies hitting Danny and states that he had a

firm grip on Danny's arm.  Thorne, Sr. did not witness Officer Karovic's alleged striking of

Danny, but he testified that before opening the door, he heard his son say "quit hitting me," and

that upon opening the door, he saw Officer Karovic's Maglite near or laying on Danny's face.

On the other hand, Officer Lelles testified that he did not see Officer Karovic hit Danny, and

noted that he never heard Danny say, "quit hitting me."  Further, the Thorne family's neighbor,

Penny Keeder testified that she witnessed the events that occurred between Danny and Officer

Karovic and did not see Officer Karovic hit Danny.[4]

At that point, Thorne, Sr. let Danny into the house.  Thorne, Sr. had a brief conversation

---

[3]There is a dispute over whether Officer Karovic had a Maglite flashlight in his possession that evening.  Officer Karovic testified that at the time of the incident, he had no Maglite flashlight, but only his own personal flashlight, a "small Streamlight Stinger flashlight, approximately six inches in length."  *See* Karovic Dep. at 32:1-33-23.  Plaintiffs, however, dispute Officer Karovic's testimony and find it questionable that the police department's "sign in/out sheets" for Maglite flashlights, are "missing and/or destroyed."  *See* Pls.' Opp. at 16.  Plaintiffs argue that, "[s]uch a problem/lack of records, should be a basis for a reasonable inference that such records support the position that Karovic, despite his denials, had a Maglite on him/his person in the evening in question as the plaintiff asserts."  *Id*. at 17.

[4]Penny Keeder lives next door to the Thorne family, and states that she could "clearly see [Danny] at the side door" of the Thornes' home when the incident occurred.  Keeder Dep. at 24:21-23.

-4-

with Officer Lelles, which led Thorne, Sr. to invite both Officer Lelles and Officer Karovic into the house through the front door. Once inside the Thornes' house, Officer Lelles asked to see Danny, explaining to Thorne, Sr. that Danny had run from the police. Upon hearing this, Thorne, Sr. began yelling at Danny.

Officer Lelles testified that at that time, he noticed that Danny's eyes were "dilated" and "bloodshot," and that Danny smelled of alcohol. Officer Lelles testified that he asked Danny if he had been drinking, and Danny responded in the affirmative. Danny, however, does not remember this discussion and denies that it occurred. Moreover, Thorne, Sr. testified that when Officer Lelles asked Danny if he had been drinking, Danny did not respond.

Thorne, Sr. then stated that he and his wife had provided Danny wine with dinner when they had eaten together at around 7:00 p.m. that evening.[5] Officer Lelles then announced his intent to arrest Danny for underage consumption of alcohol, and subsequently arrested Danny for a violation of both Ohio law and Section 529.021 of Steubenville's Codified Ordinances.[6] The

---

[5]Thorne, Sr. testified:

Q. Well, how was it that you ate supper with your son and gave him wine while he was working at the pizza shop?
A. My son used to deliver pizzas, and every night, when he'd deliver, he would come home on his break, or when he wasn't delivering, and he would stop in. We'd all sit down at the table, and me and him would eat, or me, him and his mother would eat. And my son, being a Catholic, he would take a little bit of wine. No not big – a little shot glass of wine with his dinner.

See Thorne, Sr. Dep. at 148:9-21.

[6]Ohio law prohibits underage consumption of alcohol in any public place. See OHIO REV. CODE § 4301.69(E)(1). Further, Section 529.021 of the Codified Ordinances of the City of Steubenville provides that the purchase of alcohol by a minor constitutes a minor misdemeanor. See City of Steubenville General Offenses Code § 529.021 (2006).

officers drove Danny to the county jail where he was booked.  The charges against Danny,
however, were ultimately dismissed.[7]

Plaintiffs claim that due to the alleged beating Danny suffered at the hands of Officer
Karovic, Danny suffered a concussion, which was diagnosed on June 6, 2004.  Danny also
underwent six months of treatment for a scratched cornea in his right eye, an injury that he did
not have before June 6, 2004.  Further, Plaintiffs assert that Danny now requires medication to
control his continuous and chronic headaches, suffers sever mood swings, and is unable to
concentrate in school or at his job.

### 2. The Internal Investigation

Plaintiffs requested that the Steubenville Police Department perform an internal
investigation into the events transpiring at the Thorne residence on the morning of June 6, 2004.
Sergeant John C. Sullivan ("Sergeant Sullivan"), internal affairs officer for the Steubenville
Police Department, investigated the incident as prompted by Plaintiffs' complaints.  Sergeant

---

[7]The court order dismissing the charges of underage drinking against Danny in the case
of *City of Steubenville, State of Ohio v. Daniel Joseph Thorne, Jr.*, Case No. 04CRB839
(Municipal Court of Steubenville, Oct. 19, 2004), provides:

On the 20th day of September 2004, came the Plaintiff by counsel, Frank Noble,
Esq. Steubenville Police City Prosecutor, and came the Defendant in person and by
counsel, William E. Galloway, Esq., before the Honorable Daniel G. Spahn, Judge.

Whereupon this matter came to be heard in regard to the Defendant's Motion
to Dismiss.  At this time, counsel for the Plaintiff conceded that the Plaintiff has no
evidence this under age Defendant was drinking alcohol other than what was supplied
by the Defendant's father at the Defendant's home, which is not a violation of the law.

After due consideration of all the foregoing, the Court did Adjudge, Order, and
Decree that the Defendant's Motion to Dismiss is granted and the charges against the
Defendant herein are dismissed.

Sullivan interviewed a number of individuals including Plaintiffs, Officers Basil, Lelles and Karovic, and Penny Keeder.  Further, Officer Karovic submitted to a polygraph examination, the results of which confirmed that the he was telling the truth.[8]  Danny did not submit to a polygraph examination.[9]  On September 20, 2004, after reviewing all the evidence, Sergeant Sullivan issued a report concluding that Plaintiffs' complaints regarding Officer Karovic's alleged use of excessive force and alleged false arrest of Danny were "unfounded."  Captain Sloane and Chief McCafferty subsequently reviewed and approved Sergeant Sullivan's findings on September 27, 2004 and October 4, 2004, respectively.

### 3. The Steubenville Consent Decree

At the time of the incident, Steubenville was operating under a Consent Decree, which it had entered into on September 4, 1997, pursuant to the settlement of a case brought against them by the United States Department of Justice ("DOJ").  According to the terms of the Consent Decree, Steubenville was required to develop and implement an extensive training policy for all of its police officers as well as an internal affairs policy.  The internal affairs officer had no discretion to decide whether to investigate a citizen complaint; Internal Affairs is required to investigate all citizen complaints.  Steubenville was also required to track all uses of force and

---

[8]Officer Karovic had to answer the following questions for the polygraph: (1) Did you hit Daniel Thorne, Jr. in the face with a flashlight?; (2) Did you hit Daniel Thorne, Jr. in the face with a flashlight on June 6, 2004?; and (3) Did you personally cause the injuries to Dan Thorne, Jr. by striking him in the face with a flashlight?  *See* Sullivan Dep. at 83:2-12.  Officer Karovic answered all three questions in the negative.  According to Sullivan's report, the polygraph administered to Officer Karovic was returned with a letter stating, "Please be advised that Edward K. Karovic's polygraph was evaluated as no deception indicated, and parenthesis, 'truthful.'"  *See* Sullivan Dep. at 81:2-7.

[9]Plaintiffs assert that Danny did not submit to a polygraph examination because his head injuries would have an effect on the accuracy of the results.

all warrantless searches and seizures.

Moreover, the government and Steubenville jointly selected an independent auditor, Charles D. Reynolds ("Reynolds"), to monitor Steubenville's compliance with the terms of the Consent Decree.  Reynolds was required to review and to evaluate all of the City's internal affairs reports, use of force reports, and warrantless search and seizure reports, including all reports generated by the Thorne incident.

In January 2003, Reynolds determined that Steubenville was in substantial compliance with the terms of the Consent Decree.  Moreover, after the Thorne incident occurred, Reynolds also found that Steubenville had maintained substantial compliance with the terms of the Consent Decree through the remainder of 2004.

The terms of the Consent Decree provided that the parties could terminate the Decree "at any time after *both* five years [had] elapsed [from] the date of entry of th[e] Decree, *and* substantial compliance [had] been maintained for no less than two years."  Defs.' Motion at Ex. J ¶ 96 (emphasis in original).  Accordingly, on March 3, 2005, finding that the terms had been met, the court ordered the termination of the Consent Decree.

### B. Procedural History

On January 3, 2005, Plaintiffs filed the instant complaint (the "Complaint"), asserting the following 42 U.S.C. § 1983 claims against Defendants in their individual and official capacities.[10]  In count one, Plaintiffs allege that Defendants Officers Karovic and Lelles falsely

---

[10]The Court notes that although Plaintiffs assert claims against Defendants Mucci, Williams, and McCafferty in both their official and personal capacities, Plaintiffs have made no allegations regarding any individual conduct of these Defendants which could give rise to personal capacity claims.  Rather, Plaintiffs refer to the aforementioned Defendants only in their supervisory and policy-making functions.  The Court has, therefore, analyzed Plaintiffs' claims

-8-

arrested Danny when they improperly and unlawfully detained him at his own residence without probable cause. In count two, Plaintiffs assert that Steubenville ratifies a policy of "deliberate indifference towards its citizens," allowing its police officers to conduct false arrests. In count three, Plaintiffs claim that Defendant Officer Karovic used excessive force against Danny in violation of Danny's Fourth Amendment rights, causing him serious physical and psychological injury. In count four, Plaintiffs assert that Steubenville has maintained a policy of "utilizing excessive force against its citizens during seizures over the years." In count five, Plaintiffs claim that Steubenville has a policy of failing to review and to investigate properly its citizen complaints over the years. Finally, in count six, Plaintiffs assert that Steubenville has a policy and practice "of allowing or tacitly authorizing" its police officers to use inappropriate force in conducting searches and seizures.

Plaintiffs request the following relief: (1) monetary damages in excess of $25,000 against Defendants Officers Karovic and Lelles; (2) monetary damages in excess of $150,000 from Steubenville for allowing and maintaining a policy and practice which permits false arrests to occur; (3) monetary damages in excess of $250,000 from Officers Karovic and Lelles for Danny's alleged physical injuries; (4) monetary damages in excess of $25,000 from Steubenville for allegedly failing to supervise, train, and discipline its police officers; (5) extraordinary damages against Officer Karovic in excess of $1.5 million; and (6) an order enjoining the United States Department of Justice ("DOJ") from vacating the consent decree in place in Steubenville.

On May 8, 2006, Defendants moved for summary judgment on all of Plaintiffs' claims. On June 14, 2006, Plaintiffs moved to bifurcate the issues of officer and municipal liability, but

_____

against Defendants Mucci, Williams, and McCafferty as "official capacity" claims only.

the Court denied Plaintiffs' motion on August 9, 2006.  On July 23, 2006, after Defendants'

Motion for Summary Judgment had been fully briefed, Defendants moved to strike a number of

the exhibits cited by Plaintiffs in their Opposition to Defendants' Motion for Summary

Judgment.  The Court entered an order on October 19, 2006, granting in part Defendants' Motion

to Strike and reserved its judgment on Defendants' Objection and Motion to Strike the Affidavit

of Skip Mixon.  On October 25, 2006, the parties appeared before the Court for oral argument on

Defendants' Motions.

### III. STANDARD OF REVIEW

#### A. Motion to Strike

Defendants' Motion to Strike raises an issue as to the legal sufficiency of an affidavit,

which the Plaintiffs refer to in their Responsive Brief in Opposition to Defendants' Motion for

Summary Judgment.

Although a party must produce evidence in support of its opposition to a motion for

summary judgment, not all types of evidence are permissible.  *See McQuain v. Ebner Furnaces,*

*Inc.*, 55 F. Supp. 2d 763, 769-70 (N.D. Ohio 1999).  Under Federal Rule 56(e), affidavits

supporting or opposing motions for summary judgment "shall set forth such facts as would be

admissible in evidence."  FED. R. CIV. P. 56(e).  For instance, "hearsay evidence cannot be

considered on a motion for summary judgment."  *See Wiley v. United States*, 20 F.3d 222, 225-

26 (6th Cir. 1994).  Moreover, in this Circuit, it is well settled that "'only admissible evidence

may be considered by the trial court in ruling on a motion for summary judgment.'"  *Id*. at 226

(citing *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)).  Admissible

evidence is defined as "evidence that is relevant and of such a character . . . that the court should

-10-

receive it." *See Steele v. Jennings*, 2005 WL 2124152, at *3 (S.D. Ohio Aug. 31, 2005) (citing

BLACK'S LAW DICTIONARY 235 (pocket ed. 1996)).

### B. Motion for Summary Judgment

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show there is no

genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

law." FED. R. CIV. P. 56(c). The movant has the burden of establishing that there are no genuine

issues of material fact, which may be accomplished by demonstrating that the non-moving party

lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S.

317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th

Cir. 1993). In response, the non-moving party must then present "significant probative

evidence" to show that "there is [more than] some metaphysical doubt as to the material facts."

*Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993) (citations omitted).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most

favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The

Court also must interpret all reasonable inferences in the non-movant's favor. *United States v.

Diebold, Inc.*, 369 U.S. 654, 655 (1962); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530

U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the non-

moving party and must refrain from making credibility determinations or weighing the evidence).

The existence of a mere scintilla of evidence in support of the non-moving party's position will not

be sufficient; there must be evidence from which the jury reasonably could find for the non-moving

party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986); *Copeland v. Machulis*, 57 F.3d

476, 479 (6th Cir. 1995); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (finding summary judgment appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party").

## IV. ANALYSIS

### A. Defendants' Motion to Strike

Before this Court can proceed to the merits of Defendants' Motion for Summary Judgment, it must rule on Defendants' Motion to Strike Exhibits Submitted in Support of Plaintiffs' Responsive Brief in Opposition to Defendants' Motion for Summary Judgment. Plaintiffs were granted leave to file manually their exhibits in support of their Opposition.[11] In addition to filing exhibits manually, Plaintiffs submitted a Table of Contents of their "Exhibits and Affidavits," which include a number other exhibits that were *not* filed using the Court's electronic filing system.

Defendants assert that Plaintiffs failed to serve Defendants with many of the exhibits listed in Plaintiffs' "Table of Contents" including the Affidavit by Edward "Skip" Mixon

---

[11]The Court's docket reflects that Plaintiffs manually filed the following exhibits: (1) Deposition of Penny Keeder taken by Chief McCafferty, Officer Lelles, Officer Karovic, the City of Steubenville, and City Manager Williams [Doc. No. 52]; (2) Deposition of Daniel Thorne, Jr. taken by Chief McCafferty, Officer Lelles, Officer Karovic, the City of Steubenville, and City Manager Williams [Doc. No. 53]; (3) Deposition of Vince Villon taken by Chief McCafferty, Officer Lelles, Officer Karovic, the City of Steubenville, and City Manager Williams [Doc. No. 54]; (3) Deposition of Officer Karovic taken by Plaintiffs [Doc. No. 55]; (4) Deposition of Officer Lelles taken by Plaintiffs [Doc. No. 56]; (5) Deposition of Sharon Thorne taken by Chief McCafferty, Officer Lelles, Officer Karovic, the City of Steubenville, and City Manager Williams [Doc. No. 57]; (6) Affidavit of Jamie Kaine by Plaintiffs [Doc. No. 58]; (7) Deposition of Chief McCafferty taken by Plaintiffs [Doc. No. 59]; (8) Deposition of Pete Basil taken by Plaintiffs [Doc. No. 60]; (9) Deposition of Captain James Sloane taken by Plaintiffs [Doc. No. 61]; Deposition of Daniel Thorne, Sr. taken by Chief McCafferty, Officer Lelles, Officer Karovic, the City of Steubenville, and City Manager Williams [Doc. No. 62].

("Mixon").[12]  Accordingly, Defendants move to strike Mixon's Affidavit, along with the attached

photographs of Danny taken by Mixon on June 6, 2004 because Plaintiffs never served the

affidavit and the accompanying pictures upon Defendants, and therefore, are inadmissible.[13]  The

Court finds Defendants' arguments well-taken.

      Rule 5(a) of the Federal Rules of Civil Procedure requires that all documents filed with

the Court be served on all parties.  FED. R. CIV. P. 5(a).  Because Plaintiffs failed to serve such

exhibits on Defendants, they cannot rely on any information therein in support of their

Opposition to Defendants' Motion for Summary Judgment.  In addition, Rule 26(a)(1)(B)

requires a party to provide a copy of all documents that are in the possession of the party which

the disclosing party may use to support its claims or defenses, unless solely for impeachment.

FED. R. CIV. P. 26(a)(1)(B).  Further, Rule 37(c)(1) provides, in relevant part: "A party that

without substantial justification fails to disclose such information required by Rule 26(a) . . . is

not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a

motion, any witness or information not so disclosed."  FED. R. CIV. P. 37(c)(1).  This

preclusionary rule applies to motions for summary judgment.  *See, e.g.*, *Ebewo v. Martinez*, 309

F. Supp. 2d 600, 607 n.2 (S.D.N.Y. 2004); *Vance, by and through Hammons v. U.S.*, 1999 WL

455435, at *5 (6th Cir. June 25, 1999) (if no substantial justification for late disclosure, the court

---

[12]The Court entered an order on October 19, 2006, granting Defendants' Motion to Strike with respect to the other exhibits listed in Plaintiffs' "Table of Contents," reserving its judgment on Defendants' Objection and Motion to Strike the Affidavit of Skip Mixon.

[13]According to the Mixon Affidavit, Mixon was contacted by Thorne, Sr. on June 6, 2004 and asked to come to the Thorne residence to examine Danny and photograph him.  Mixon testified that he was "very familiar with photography and [has] operated a family business with photography for the past twenty years in the Ohio Valley area."  *See* Mixon Aff. ¶ 4.  The photographs are images of Danny's alleged injuries.

may, in its discretion, strike a witness' affidavit from the record); *Sessoms v. Ghertner & Co.*, 2006 WL 1102323, at *3-4 (M.D. Tenn. Apr. 26, 2006) (denying motion to strike because defendants brought the existence of the witnesses in question to plaintiffs' attention during depositions). The purpose of this exclusionary rule is to prevent the practice of "sandbagging" an opposing party with new evidence. *Ventra v. United States*, 121 F. Supp. 2d 326, 332 (S.D.N.Y. 2000). Most courts recognize, however, that preclusion of evidence pursuant to Rule 37(c)(1) is a drastic remedy and should be exercised with caution; "[t]he Court's responsibility, upon finding that the failure to comply with Rule 26 is neither justified nor harmless, is to impose a sanction that is proportionate to the infraction." *Cuadell v. City of Loveland*, 2006 WL 971051, at *3 (S.D. Ohio Apr. 10, 2006) (citing *Dickenson v. Cardiac and Thoracic Surgery of Eastern Tennessee, P.C.,* 388 F.3d 976, 983 (6th Cir. 2004) (citing *Musser v. Gentiva Health Servs.,* 356 F.3d 751, 756 (7th Cir. 2004))) (granting motion to strike witness upon plaintiff's failure to provide a substantial justification for its late disclosure of the witness' affidavit).

In this case, Plaintiffs did not serve Defendants' with the Mixon affidavit or the pictures Mixon sought to authenticate through his affidavit. Defendants admit that Mixon was disclosed as a witness in response to an interrogatory, but assert that the affidavit was never included in Plaintiffs' filing of their Response in Opposition and the pictures were never disclosed to Defendants pursuant to Rule 26(a)(1)(B).

Based on the evidence before the Court, Plaintiffs have no "substantial justification" for failing to provide Defendants with Mixon's affidavit and referenced photos. Accordingly, the Court **GRANTS** Defendants' Motion to Strike the Mixon Affidavit, and the attached photographs, from the record.

## B. Defendants' Motion for Summary Judgment

## 1. Plaintiffs' False Arrest Claim

In count one of the Complaint, Plaintiffs assert that Defendants Officers Karovic and Lelles falsely arrested and illegally seized Danny under color of state law.

### a. Warrantless Entry

Defendants assert that they are entitled to summary judgment on count one because Officers Karovic and Lelles were entitled to make a warrantless entry into the Thorne family's yard to seize Danny.

The Fourth Amendment states in pertinent part that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. Moreover, it is a fundamental tenet of Fourth Amendment jurisprudence that "searches and seizures inside a home without a warrant are presumptively unreasonable." *United States v. Rohrig*, 98 F.3d 1506, 1513 (6th Cir. 1996) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980) (reversing defendant's conviction because police officers' warrantless entry into defendant's home was unlawful)). It is undisputed that a fenced backyard receives Fourth Amendment protection. *See United States v. Jenkins*, 125 F.3d 768, 772-73 (6th Cir. 1997).

Absent a warrant, only "exigent circumstances" may justify governmental entry into a private home. *Payton*, 445 U.S. at 586 (1980); *Jones v. Lewis*, 874 F.2d 1125, 1130 (6th Cir. 1989); *see also, Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002). "Exigent circumstances are situations where real immediate and serious consequences will certainly occur if a police officer postpones action to obtain a warrant." *Spencer v. City of Bay City*, 292 F.

Supp. 2d 932, 943 (E.D. Mich. 2003) (citing *United States v. Williams,* 342 F.3d 430, 436 (6th Cir. 2003); *Thacker v. City of Columbus,* 328 F.3d 244, 253 (6th Cir. 2003)). The government bears the burden of proving the existence of exigent circumstances. *United States v. Bates,* 84 F.3d 790, 794 (6th Cir. 1996). The Sixth Circuit has explained that the following situations may give rise to exigent circumstances: "(1) hot pursuit[14] of a fleeing felon; (2) imminent destruction of evidence; (3) the need to prevent a suspect's escape; and (4) a risk of danger to the police or others." *United States v. Johnson,* 22 F.3d 674, 680 (6th Cir. 1994) (internal citations omitted); *see also Minnesota v. Olson,* 495 U.S. 91, 100 (1990). The Sixth Circuit has also set forth three

---

[14]In *United States v. Rohrig*, the Sixth Circuit engaged in a detailed discussion of each of prongs of the "exigent circumstances" analysis. *See* 98 F.3d at 1515-18. In discussing the "hot pursuit" prong, the *Rohrig* court wrote:

> The "hot pursuit" justification for warrantless entry into a house derives primarily from the Supreme Court cases of *Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294 (1967), and *United States v. Santana*, 427 U.S. 38 (1976). In *Hayden*, upon being informed by witnesses that an armed robber had entered a home minutes earlier, the police pursued the suspect into the home without first attempting to secure a warrant. 387 U.S. at 297. Because "[s]peed here was essential" in order "to find a suspected felon, armed, within the house into which he had run only minutes before the police arrived," the Court concluded that the warrantless entry was reasonable. *Id*. at 299. The Court reasoned that "[t]he Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *Id*. at 298-99. Similarly, in *Santana*, the Court upheld a warrantless entry into a home where the defendant, a suspect in an ongoing drug transaction, had been standing in the doorway with a brown paper bag in her hand, but had retreated into the vestibule as police officers pulled up to her house and shouted "police" while exiting their vehicle. 427 U.S. at 40, 43. The Court found that the officers' entry through the open door of the defendant's house constituted "hot pursuit," and thus was permitted both under *Hayden* and in light of the officers' "realistic expectation that any delay would result in destruction of evidence." *Id*. at 42-43.

*See* 98 F.3d at 1515. The Court notes that the facts at issue in this case do not rise to the level of those set forth in the cases cited above.

factors that a court may use when inquiring whether "exigent circumstances" existed: (1) whether the government has demonstrated that the need for immediate action would have been defeated if the police had taken the time to secure a warrant; (2) whether the government's interest is sufficiently important to justify a warrantless search; and (3) whether the defendant's conduct somehow diminished the reasonable expectation of privacy he would normally enjoy. *Rohrig,* 98 F.3d at 1518.

In a civil action, the determination of whether exigent circumstances existed is properly resolved by the jury. *Jones,* 874 F.2d at 1130; *Yancey v. Carroll County*, 876 F.2d 1238, 1244 (6th Cir. 1989); *Reardon v. Wroan*, 811 F.2d 1025 (7th Cir. 1987). It is equally clear, however, that in a case where the underlying facts are essentially undisputed, and where the fact-finder could reach but one conclusion as to the existence of exigent circumstances, the issue may be decided by the trial court as a matter of law. *See Hancock v. Dodson*, 958 F.2d 1367, 1375 (6th Cir. 1992) (citing *Jones,* 874 F.2d at 1130; *Reardon,* 811 F.2d at 1029-30).

Defendants assert that Officer Karovic had probable cause to enter the Thornes' backyard because he was in "hot pursuit"of Danny, a "fleeing suspect." Finding that the nature of Danny's alleged offense does not rise to a level of seriousness that might justify a warrantless government intrusion, the Court disagrees. It is well-established that "an important factor to be considered when determining whether an exigency exists is the gravity of the underlying offense." *Welsh v. Wisconsin*, 466 U.S. 740, 743 (1984); *see also, Rohrig*, 98 F.3d at 1516 ("the seriousness of the underlying offense affects the weight of the governmental interest being served by the intrusion," and such interests are "at an ebb" when minor offenses are involved). In *Welsh*, police officers followed a suspected drunken driver into his home to arrest him for that

offense and to obtain evidence of his blood alcohol content. *See* 466 U.S. at 740. The police had

neither an arrest nor a search warrant. *See id*. The state court upheld the action on the basis of

exigent circumstances, consisting of the hot pursuit of a criminal suspect, the need to prevent

physical harm to the suspect and the police, and the need to prevent the destruction of evidence.

*See id*. The Supreme Court reversed, and held that "application of the exigent-circumstances

exception in the context of a home entry should rarely be sanctioned when there is probable

cause to believe that only a minor offense, such as the kind at issue in this case, has been

committed." *Id*. at 753.

Other courts have applied the holding in *Welsh* to invalidate arrests and searches in the

face of exigent circumstance claims based on the possible dissipation of evidence in petty,

alcohol-related offense cases. *See City of Jamestown v. Dardis,* 618 N.W.2d 495, 499 (N.D.

2000) (holding that "probable cause to believe minors were illegally consuming alcohol was a

relatively minor infraction and did not create exigent circumstances to justify a warrantless entry

into a home"); *State v. Bessette,* 21 P.3d 318, 321 (Wash. Ct. App. 2001) (holding that exigent

circumstances did not exist when police officer went into home to arrest a minor he saw holding

a bottle of beer because a minor in possession is a minor offense and there was no evidence of a

threat to the safety of other individuals); *Commonwealth of Penn. v. Roland,* 637 A.2d 269, 271

(Pa. 1994) (holding that warrantless, nighttime entry into residence by police investigating a

report that there was underage drinking and marijuana use at a party was improper because there

was no danger to police that would have necessitated immediate entry, and the possibility that

beer cans seen by officers might have been removed before a warrant could be obtained would

not support a warrantless entry to investigate summary offense of underage drinking). Further,

-18-

Ohio courts have previously held that the exigent circumstances exception is not applicable to a misdemeanor offense. *State v. Davis*, 726 N.E.2d 1092 (Ohio App. 1999); *State v. Scott M.*, 733 N.E.2d 653 (Ohio App. 1984); *Cleveland v. Shields*, 663 N.E.2d 726 (Ohio App. 1995).

In this case, the offense committed – if any at all – was a minor offense. Officers Karovic and Lelles were on the scene in search of individuals who had allegedly been involved in, or fled from, a fight. Under Ohio law, "engaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior" constitutes a minor misdemeanor in most cases. *See* OHIO REV. CODE § 2917.11(A)(1), (E)(1)-(2).[15] Accordingly, Plaintiffs' Fourth Amendment interest in the privacy of their fenced-in backyard outweighs the government's interest in pursuing Danny without a warrant. Further, although Officers Karovic and Lelles assert that Danny's decision to run from them gave them a reason to believe that they were in danger,[16]

_____

[15]Disorderly conduct is considered a misdemeanor of the fourth degree, rather than a minor misdemeanor, in the following situations:

(a) the offender persists in disorderly conduct after reasonable warning or request to desist.
(b) The offense is committed in the vicinity of a school or in a school safety zone.
(c) The offense is committed in the presence of any law enforcement officer, firefighter, rescuer, medical person, emergency medical services person, or other authorized person who is engaged in the person's duties at the scene of a fire, accident, disaster, riot, or emergency of any kind.
(d) The offense is committed in the presence of any emergency facility person who is engaged in the person's duties in an emergency facility.

*See* OHIO REV. CODE § 2917.11(E)(3).

[16]Lelles testified,

We had—based on the hour of the evening, the type of call, not knowing whose residence this was, for the safety of the residence, the safety of the officers and other neighbors, we had every right, a warrantless entry into that yard, barring what you talked about earlier, exigent circumstances or anything else, to engage that individual,

given the fact that there is a dispute as to whether the Officers had identified themselves to

Danny before he ran to his house, and the indications that the Officers had no reason to believe

that Danny was an armed and dangerous felon, the Court finds their claims insufficient to

support a motion for summary judgment.  Accordingly, the issue of whether Officers Karovic

and Lelles were entitled to make a warrantless entry into the Thorne's backyard is more

appropriately reserved for a jury.

### b. Probable Cause for Arrest

"It is well established that any arrest without probable cause violates the Fourth

Amendment." *Thacker*, 328 F.3d at 255 (citing *Crockett v. Cumberland Coll.*, 316 F.3d 571, 580

(6th Cir. 2003)).  Thus, in order for a wrongful arrest claim to succeed under § 1983, a plaintiff

must prove that the police lacked probable cause.  *See Feathers v. Aey*, 319 F.3d 843, 851 (6th

Cir. 2003).  Having found that Officers Karovic and Lelles were not entitled to make a

warrantless entry into the Thornes' backyard, the Court must next consider the validity of

Defendants' assertion that they are entitled to summary judgment as to Plaintiffs' false arrest

claim because Officers Karovic and Lelles had probable cause to arrest Danny for underage

drinking.

For probable cause to exist, the "facts and circumstances within the officer's knowledge

[must be] sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the

---

identify him.  It could have been a juvenile, there were juveniles in that vehicle.  Could
have been an array of things.  It could have been a perpetrator, the perpetrator involved
in the assault that I spoke about earlier, the attempted assault where [Officer] Sloane
was interviewing the white male at the scene.  So there is an array of things.

Lelles Dep. at 88:13-89:5.

circumstances shown, that the suspect has committed, is committing, or is about to commit and offense." *Crockett*, 316 F.3d at 580 (citing *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979); *Hinchman v. Moore*, 312 F.3d 198, 204 (6th Cir. 2002)). Put simply, "a police officer has probable cause if there is a fair probability that the individual to be arrested has either committed or intends to commit a crime." *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) (internal citations omitted). The question of whether a probability of criminal activity exists is assessed under a reasonableness standard based on "an examination of all facts and circumstances within an officer's knowledge at the time of an arrest." *Estate of Dietrich v. Burrow*, 167 F.3d 1007, 1012 (6th Cir. 1999). "Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams*, 407 U.S. 143, 149 (1972). The existence of probable cause is a jury question, unless only one reasonable determination is possible. *Crockett*, 316 F.3d at 581; *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2002).

In this case, Plaintiffs and Defendants give two different versions of the facts concerning Danny's arrest for underage drinking. Officer Lelles claims that when Thorne, Sr. let himself and Officer Karovic into the house, he observed that Danny's eyes were bloodshot and dilated, and he smelled of alcohol.[17] Lelles testified:

> And we're talking, I'm looking, [Danny's] eyes are, like, real bloodshot, eyes are dilated. I could detect an odor of an alcoholic beverage emitting from [him]. Somewhere through there, I had asked [Danny] if he had been drinking. And he

---

[17]Officer Lelles was the senior officer, and Officer Karovic testified that he took over the initial conversation once Thorne, Sr. let them into the home.

replied yes.[18]  And I believe I asked him how old he was, and I believe he told me at the time he was 18.  Thorne, Sr., then starts chastising [Danny] or yelling at him for drinking, like he didn't have a clue, one, that the kid was drinking.

*Id.*[19]  Defendants also assert that Danny's alcohol consumption is further supported by Penny Keeder's testimony that there was evidence of underage drinking at the nearby party from which Danny had allegedly fled.[20]  Plaintiffs, however, claim that Danny, rather than being intoxicated, was in a daze from being struck with the Maglite flashlight and frightened by Officer Lelles' line of questioning.  Moreover, both father and son assert that when Officer Lelles questioned him, Danny never admitted to drinking, and they claim any odor of alcohol was wholly attributable to wine that the Thorne family had consumed with dinner earlier in the evening.[21]

--------

[18]Although the Officers testified that Danny admitted to being drunk, Danny claims that he does not remember the conversation occurring.  Thorne, Sr. also testified that Danny never told the officers he had been drinking.  Thorne, Sr. stated:

> The only question was, "You was at the party next door drinking; wasn't you?  You was at the party next door drinking."  My son was looking at [Officer Lelles].  My son was, what I would say, traumatized, in a daze, just looking at him and wouldn't respond no way.  And that's when I responded and says, "Daniel, tell him the truth. I gave you the alcohol.  And at that point in time, when I remember seeing [Sergeant] Gotschall saying, "You committed a crime then."  Patrolman Lelles said same thing. "Well, you can go to jail, too."  Telling me I can go to jail in my own house for giving my son alcohol.

*See* Thorne, Sr. Dep. at 142:14-143:18.

[19]Though Officer Karovic was present during Officer Lelles' questioning of Danny, he does not recall whether he could smell alcohol on Danny.  Karovic Dep. at 91:9.

[20]According to Ms. Keeder, after the party was over she saw numerous "beer bottles and beer cans," though she did not know who had been drinking.  Keeder Dep. at 44:24-45:1, 14.

[21]Although Plaintiffs also claim that the fact that the City dropped all charges against Danny on October 19, 2004 is further evidence that there was no probable cause to arrest him on June 5, 2006, their assertions run counter to the law.  *See DeFillipo*, 443 U.S. at 37 (noting that the fact that charges are later dismissed is irrelevant to the determination of whether there was probable cause for that arrest); *see also, Baker v. McCollan*, 443 U.S. 137, 145-45 (1979) ("The

Because the record presents two entirely different interpretations of the facts, both of which are plausible, and viewing the evidence in a light most favorable to Plaintiffs, a determination as to whether the Defendant officers had probable cause to arrest Danny for underage drinking is best reserved for resolution at trial.

### c. Qualified Immunity

Defendants also assert that regardless of whether the Court finds that Officers Karovic and Lelles had probable cause to make a warrantless entry into the Thornes' backyard or probable cause to arrest Danny, Officers Karovic and Lelles are entitled to qualified immunity for Plaintiffs' false arrest claim.

Qualified immunity is an affirmative defense that shields public officials performing discretionary functions from civil damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). A qualified immunity defense involves a three-step inquiry. *Saucier v. Katz,* 533 U.S. 194, 200 (2001). The Court must determine: (1) whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show a that constitutional violation has occurred; (2) whether the violation involved a clearly established constitutional right of which a reasonable person would have known; and (3) whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights. *Feathers v. Aey,* 319 F.3d 843, 847 (6th Cir. 2003) (quotations and citations omitted); *see also Saucier,* 533 U.S.

---

Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted – indeed, for every suspect released.").

at 200. While the issue of whether a defendant is entitled to qualified immunity is usually a purely legal question to be determined by the court, summary judgment is inappropriate where "the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury." *Adams v. Metiva,* 31 F.3d 375, 387 (6th Cir.1994) (citing *Brandenburg v. Cureton,* 882 F.2d 211, 215-16 (6th Cir.1989)). In other words, if, under Plaintiffs' version of the disputed facts Defendants are not entitled to qualified immunity, a genuine issue of material fact exists and the Court may not grant summary judgment for Defendants. The Court, therefore, bases its qualified immunity inquiry upon the facts taken in the light most favorable to Plaintiffs, drawing all inferences in their favor. *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 900 (6th Cir. 2004).

The Court has already determined that Plaintiffs have presented sufficient evidence with respect to their Fourth Amendment claims to survive Defendants' Motion for Summary Judgment. Thus, the question of whether Officers Karovic and Lelles are shielded from liability under the doctrine of qualified immunity turns on: (1) whether the rights were clearly established to the extent that Officers Karovic and Lelles would have reasonably known that they were violating Danny's Fourth Amendment rights; and (2) whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. 194 at 202.

Certain relevant legal principles were well-established at the time of the conduct at issue in this case. First, it is apparent from *New York v. Payton* and its progeny that warrantless entries into a private home or its surroundings (i.e., a fenced-in yard) are presumptively illegal, absent exigent circumstances. 445 U.S. at 586; *see Jenkins*, 125 F.3d at 772-72. Second, *Welsh*

*v. Wisconsin* had established that any exigent circumstances inquiry must consider the nature of the offense that an officer is investigating or for which an arrest is sought. 466 U.S. at 753. More generally, *Welsh v. Wisconsin* held that the exigent circumstances exception to the warrant requirement should only rarely be invoked in cases involving a minor offense. *Id*. Third, it is clearly established that police officers must base arrests on probable cause. *St. John v. Hickey,* 411 F.3d 762, 770 (6th Cir. 2005) (citing *Radvansky v. City of Olmsted Falls,* 395 F.3d 291, 310 (6th Cir. 2005); *Klein,* 275 F.3d at 550 (6th Cir. 2001); *Donovan,* 105 F.3d at 298 (6th Cir. 1997)).

The question becomes, then, whether a reasonable officer in the position of Officers Karovic and Lelles should have known that the facts of this case did not present such a rare situation that a warrantless entry was justified. Stated differently, the Court must decide whether the circumstances confronting Defendant Officers outside Plaintiffs' home could have led to the reasonable conclusion, even if mistaken, that an exigency existed that would excuse the lack of a warrant.

The Court finds that the record viewed most favorably to Plaintiffs defeats qualified immunity. As discussed above, Defendant Officers' pursuit of Danny in his own backyard was in response to a complaint of suspects fleeing from a fight – a misdemeanor offense. Further, there is a dispute as to whether the Defendant officers were justified in feeling concerned for their own safety and/or the safety of the rest of the neighborhood when Danny hid from them. Moreover, once Officers Karovic and Lelles were inside the Thorne house, there is a dispute as to whether the evidence suggested that Danny was intoxicated. Accordingly, until the jury resolves the issue of whether a constitutional violation occurred, Defendants are not entitled to

qualified immunity from liability for their warrantless entry onto Plaintiffs' property or the arrest of Danny that followed.

The Court **DENIES** Defendants' Motion for Summary Judgment as to count one.

## 2. Plaintiffs' Excessive Force Claim Against Officer Karovic

In count three of the Complaint, Plaintiffs assert that Defendant Karovic used excessive force when he seized Danny, violating Danny's Constitutional rights, and causing Danny physical and psychological injuries. Defendants assert that they are entitled to summary judgment on Plaintiffs' excessive force claim, pursuant to the "physical facts rule."

The Supreme Court has held that "all claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotation omitted). A reviewing court "should pay particular attention to 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001) (quoting *Graham*, 490 U.S. at 396).

In evaluating an excessive force claim, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Moreover, "the calculus of

-26-

reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id*. at 396-97.  While it is well-established in the Sixth Circuit that the gratuitous use of force on a suspect who has already been subdued is unconstitutional, *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988), "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (citations omitted).

Plaintiffs assert that Officer Karovic hit Danny on the head multiple times with a Maglite flashlight, causing him permanent physical and psychological injuries.  Plaintiffs have submitted testimony in support of Plaintiffs' claims that after June 5, 2004, Danny suffered from a concussion, a scratched cornea, severe migraines, and many other physical ailments, both physical and psychological, that will cause him to be dependent on medication for life.  Officer Karovic denies hitting Danny, and Penny Keeder testified that she watched the interaction between Officer Karovic and Danny and did not see the officer strike Danny.  Further, Defendants assert that the booking photos of Danny taken the morning of the incident do not show any injury, and due to Officer Karovic's large size, it would be expected that if Danny had been hit, "redness, bruising, swelling or other signs of physical trauma would develop and be visually evident." *See* Defs.' Motion at 22.  Accordingly, Defendants assert that the "physical facts" of the incident do not support Danny's testimony.

Ordinarily, where testimony conflicts, the credibility of witnesses is a matter for the jury. In cetain instances, however, testimony cannot be considered credible.  *Harris v. Gen. Motors. Corp.*, 201 F.3d 800, 803 (6th Cir. 2000).  Where a witness testifies that he looked and listened

at a railroad crossing, but neither saw nor heard a train approaching, and the only reasonable

conclusion upon the evidence is that there is no doubt that had he looked he must have seen the

train, the witness' testimony cannot be considered credible.  *Harris*, 201 F.3d at 803 (citing

*Detroit, Toledo & Ironton Rd. Co. v. Rohrs*, 151 N.E. 714 (Ohio 1926)).

> The 'railroad crossing' cases are a single example of the broad range of cases in which
> courts have recognized that eye-witness' testimony, essential though it may be, is
> fundamentally 'soft' evidence, subject to human failings of perception, memory and
> rectitude.  In law, as in other spheres of human affairs, simple facts may be far more
> persuasive than the most learned authorities.  As in Dean Prosser's homely example,
> 'there is still no man who would not accept dog tracks in the mud against the sworn
> testimony of a hundred eye-witnesses that no dog has passed by.

*See id.* (citing PROSSER ON TORTS 212 (4 Ed.)).  The name generally given to this concept is the

"physical facts rule."  *Id.*[22]  Under the physical facts rule, "where the palpable untruthfulness of

plaintiff's testimony is evident because the testimony is obviously inconsistent with, contradicted

by, undisputed physical facts, summary judgment is warranted notwithstanding testimony

offered by the plaintiff."  *Id.* (internal quotations and citations removed).[23]

The primary difficulty with application of the physical facts rule to this case is that

---

[22]The "physical facts rule" has been stated in a number of different ways.  For instance,
"The testimony of a witness which is opposed to the laws of nature, or which is clearly in
conflict with principles established by the laws of science, is of no probative value, and a jury is
not permitted to rest its verdict thereon."  *Harris*, 201 F.3d at 803.  Also, "The testimony of a
witness which is positively contradicted by the physical facts cannot be given probative value by
the court."  *Id.* (citing *Lovas v. Gen. Motors Corp.*, 212 F.2d 805, 808 (6th Cir. 1954)).

[23]The *Harris* court noted,

the physical facts rule is entirely consistent with the standard set forth in F.R.C.P. 56(c) –
that summary judgment is warranted where there is no '*genuine* issue as to any material
fact.'  Obviously, where the only evidence submitted by a non-movant is contradicted by
indisputable physical facts, there can by no *genuine* issue of material fact for trial.

*See* 201 F.3d at 803 n.1.

Defendants' deposition testimony and affidavits do not establish *undisputed* physical facts fatal

to Plaintiffs' excessive force claim. Despite Defendants' arguments to the contrary, at this stage

of the litigation, Danny's testimony that Officer Karovic struck him, when combined with

Danny's admissible medical records and Thorne, Sr.'s supporting testimony, is enough evidence

that Danny was injured during the incident to withstand Defendants' Motion for Summary

Judgment on the excessive force claim. The dispute between Plaintiffs and Defendants as to

whether Officer Karovic beat Danny in an attempt to subdue him is a question of material fact

sufficient to allow Plaintiffs' excessive force claim to proceed to trial. Accordingly, the Court

**DENIES** Defendants' Motion for Summary Judgment as to count three.

### 3. Plaintiffs' *Monell* Claims - Counts Two, Four, Five and Six

In counts two, four, five, and six of the Complaint, Plaintiffs assert that Defendants[24] are

liable for the alleged constitutional violations by its police officers because they: (1) tacitly

authorize a policy of deliberate indifference as to its citizens; (2) condone a pattern of excessive

force against its citizens; (3) fail to supervise and to respond properly to civilian complaints

against police misconduct; and (4) fail to train and to supervise City police officers in the tactics

of "making arrests and using appropriate force when searching and seizing individuals."

Defendants assert that they are entitled to summary judgment as to counts two, four, five, and six

because Plaintiffs have set forth no evidence to support their claims, and because the City was

---

[24]Plaintiffs assert counts two, four, five and six against the Defendants in their official capacities. An action against a person in his official capacity is the same as an action against the government entity for whom the person works. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985); *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1009 (10th Cir. 1998). Thus, the immunities available to a defendant in an official-capacity action are those that the government entity possesses. *Graham*, 473 U.S. at 167.

adjudged to be in full compliance with the Consent Decree in April 2003.

In a 42 U.S.C. § 1983 case, government entities cannot be held liable under a theory of *respondeat superior*. *See Monell v. Dep't. of Social Servs. of the City of New York*, 436 U.S. 658, 691 (1978). Municipal entities can be held liable under 42 U.S.C. § 1983 only where the alleged constitutional violation is caused by the entity's official policy. *Id.* at 694. Further, in order to demonstrate liability, a plaintiff must show that the official policy in question is the "moving force" behind the constitutional violation. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (citing *Monell*, 436 U.S. at 694). Unless an official policy-maker is involved in the underlying constitutional violation, the existence of an official policy or custom cannot be demonstrated by the occurrence of the alleged constitutional violation itself. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985).

### a. Count Two - Policy and Tacit Authorization of False Arrests

Plaintiffs allege that the "City of Steubenville, through its police and its supervisory officials [has] condoned, tacitly authorized and/or ratified a 'policy' of deliberate indifference toward its citizens" with regard to false arrests. In order to impose federal liability upon Steubenville under this claim, Plaintiffs must establish that the City was deliberately indifferent to such violations. *City of Canton*, 489 U.S. at 388. This requires Plaintiffs to establish that the need for more or different training of the City's police officers was so obvious and likely to result in the violation of constitutional rights that the policy makers of Steubenville can reasonably said to have been deliberately indifferent in that regard. *See id.* at 390.

Plaintiffs have alleged that this "policy" is noted in Steubenville's Consent Decree. The

-30-

Consent Decree itself, however, denies the existence of such a "policy."[25]  Apart from making

vague assertions that the policies and procedures instituted by the City pursuant to the Consent

Decree are merely "for show," Plaintiffs have pointed to no concrete evidence that the City has a

policy of condoning false arrests of its citizens.  Plaintiffs devote approximately sixteen pages of

their Opposition to nearly indecipherable musings about how "there are serious issues of making

the theoretical and the written policies and practices which have been putatively updated, in fact,

adopted and applied into the real world of day to day policing inside the [C]ity."  Without factual

support, such baseless allegations that history has repeated itself cannot withstand a motion for

summary judgment.  Accordingly, Defendants' Motion for Summary Judgment as to count two

is **GRANTED**.

### b. Count Four - Policy of Condoning a Pattern of Excessive Force

Plaintiffs also allege that over the years, Steubenville "has created a police [sic] of

deliberate indifference towards its citizens."  The standards for this claim are the same as set

forth above in regards to Plaintiffs' claim that the City has a policy of authorizing false arrests of

its citizens.  *See supra* Part IV.B.3.a.; *City of Canton*, 489 U.S. at 390 (requiring a plaintiff to

establish that the need for more or different training of the city's police officers was so obvious

---

[25]The Consent Decree reads:

The City denies the allegations advanced by the United States.  The City
acknowledges that allegations have been advanced against the City relating to the its
[sic] management systems for police training, misconduct investigations, supervision
and discipline.  The City denies such allegations.  However, the parties agree that the
manner and means of avoiding such claims is to achieve and maintain good practices
and procedures for police management.  The parties enter into this Decree jointly and
for the further purpose of avoiding the risks and burdens of litigation.

Defs.' Motion at Ex. J ¶ 3.

and likely to result in the violation of constitutional rights that the city's policy makers can reasonably said to have been deliberately indifferent in that regard).

Once again, Plaintiffs have failed to set forth evidence to support their claim. Plaintiffs' only cited evidence is the existence of more than a dozen complaints of excessive force and improper police conduct filed with the City in 2004. *See* Pls.' Opp. at 56. Other courts have held that such evidence does not support a *Monell* claim. *See, e.g.*, *Sarus v. Rotundo,* 831 F.2d 397, 402 (2d Cir. 1987) (finding a number of resisting arrest charges filed by police did not suggest policy of indifference to excessive use of force where plaintiff failed "to adduce evidence of the circumstances surrounding those arrests, or even to present corresponding figures from other police departments"); *Singleton v. City of Newburgh,* 1 F. Supp. 2d 306, 311 (S.D.N.Y. 1998) (granting summary judgment on *Monell* claim because three complaints of alleged excessive use of force do not demonstrate deliberate indifference to use of excessive force); *Fincher v. County of Westchester,* 979 F. Supp. 989, 1006 (S.D.N.Y. 1997) (granting summary judgment on *Monell* claim although two prior complaints against the municipality were settled requiring additional officer community relations training and in the face of claims of failure to train, supervise and investigate); *Mendoza v. City of Rome,* 872 F. Supp. 1110, 1118-19 (N.D.N.Y. 1994) ("claims. . .filed against the City, standing alone, do[ ] not establish a pattern, policy, or practice which [is] causally related to the. . . use of excessive force upon the plaintiff . . . and does] not constitute evidence of violation of Constitutional rights").

Because Plaintiffs' conclusory allegations about Steubenville's misconduct are not sufficient evidence of a municipal policy or custom of excessive force, Defendants' Motion for Summary Judgment as to count four is **GRANTED**.

### c. Count Five - Failure to Investigate and Respond to
### Civilian Complaints of Police Misconduct in a Proper Manner

Plaintiffs seek to establish Steubenville's municipal liability by asserting a claim that the City fails to respond properly to citizen complaints against the police. Generally, a subsequent failure to conduct a meaningful investigation is not legally the "moving force" behind an alleged constitutional violation. *Daniels v. City of Columbus,* 2002 WL 484622, *5 (S.D. Ohio Feb. 20, 2002) (citing *Tompkins v. Frost,* 655 F. Supp. 468, 472 (E.D. Mich.1987) ("wrongful conduct after an injury cannot be the proximate cause of the same injury")); *see also, Fox v. VanOosterum,* 987 F. Supp. 597, 604 (W.D. Mich.1997) (explaining that the argument that a decision not to investigate, made after alleged violation took place, somehow caused that violation, defies logic). "[I]n some cases, the municipality may be held liable when its failure to conduct an investigation or discipline the accused rises to the level of a policy of acquiescence that in itself was the 'moving force.'" *See Daniels,* 2002 WL 484622, at *5. Even so, a "municipal policy or custom is shown by ratification only where the city's failure to investigate and discipline the alleged misconduct supports an inference that the city approves of or tolerates the misconduct." *See Murphy v. City of Reynoldsburg,* 1991 WL 150938 (Ohio Ct. App. Aug. 8, 1991). Where a municipality "fully investigates allegations of misconduct and in good faith determines that no misconduct occurred or that no discipline was warranted, there can be no reasonable inference that the municipality tolerates the alleged misconduct." *Id.* at *12; *see also, Dorsey v. City of Detroit,* 858 F.2d 338, 345 (6th Cir. 1988).

In this case, the Court finds that there can be no serious contention that Steubenville ratified the alleged misconduct of Officers Karovic and Lelles by failing to investigate or discipline the Thornes' complaint. After the Thornes filed an official complaint in early June

2004, Officer Sullivan conducted a thorough investigation, which included interviews of the parties and relevant witnesses, even going so far as to conduct a polygraph on Officer Karovic. Sullivan's investigation followed the policies outlined in the Consent Decree, and culminated in a detailed fifty-five page report, which was finalized on September 20, 2004.  According to that report, Sullivan determined that the Thornes' allegations were "unfounded."[26]  Further, and also in accordance with the protocol set forth in the Consent Decree, both Captain Sloane and Chief McCafferty found Sullivan's report to be accurate under the circumstances.  Hence, the most Plaintiff could establish is that Reynolds, Sloane, and McCafferty reached the *wrong* conclusion. As a matter of law, however, such a conclusory argument fails to rise to the level of deliberate indifference necessary to show an unlawful policy or custom for purposes of § 1983. Defendants' Motion for Summary Judgment as to count five is, therefore, **GRANTED**.

### d. Count Six - Failure to Train

Plaintiffs also claim that the City "failed to supervise and train its police officers," thereby leading to constitutional violations.  In order to sustain a claim against Steubenville on a

---

[26]According to the Consent Decree, at the end of the investigation, the Internal Affairs ("IA") officer

> Shall give the investigative file to the Chief of Police, and shall make one of the following dispositions:
> "Sustained," where a preponderance of the evidence shows that misconduct or inappropriate behavior occurred.
> *"Unfounded" where a preponderance of the evidence shows that misconduct or inappropriate behavior did not occur.*
> "Not resolved," where there is insufficient evidence to decide what happened.
> "Exonerated," where the conduct described by the complainant or other referral source occurred, but did not violate SPD policy.

Defs.' Motion at Ex. J ¶ 51 (emphasis added).

theory of "failure to train," Plaintiff must establish that: (1) the training program at issue is inadequate to the tasks that officers must perform; and (2) the inadequacy is the result of the City's deliberate indifference; and (3) the inadequacy actually caused the Plaintiff's alleged injury. *See Sheperd v. City of Columbus*, 2006 WL 840386, *8 -9 (S.D. Ohio, Mar. 30, 2006) (citing *City of Canton, Ohio v. Harris,* 489 U.S. 378, 390-97 (1989)); *see also, Bd. of County Commissioners of Bryan County. v. Brown,* 520 U.S. 397, 407 (1997) (finding that to make out a claim for failure to supervise, plaintiff must identify a deficiency in the training program and show that the specific deficiency actually *caused* a constitutional violation).  In order to prove "deliberate indifference," Plaintiffs must show the need for better training was so obvious that the inadequacy was likely to result in a constitutional violation. *Barber v. City of Salem,* 953 F.2d 232 (6th Cir. 1992).

In this case, Plaintiffs have failed to set forth evidence that Steubenville failed to supervise or train its police officers.  Before serving on the force, the City requires that all prospective police officers complete a sixteen week "Field Training Officer" ("FTO")[27] in-service training program with the Steubenville Police Department.  Further, the officers go through frequent review courses in which they discuss topics such as "use of force," "subject control," and other related issues.  Moreover, after the DOJ and the City finalized the Consent Decree, in the late 1990s, the City was obligated to follow a number of detailed procedures regarding topics such as "use of force," and "stops, searches, and seizures," even instituting and implementing an Internal Affairs department to investigate any alleged problems.  Defs. Motion

---

[27]According to the Consent Decree, "'Field Training Officer' or 'FTO' means an experienced police officer whose responsibilities include providing on-the-job training and supervision of probationary police officers, and continual training of all police officers."  Defs.' Motion at Ex. J ¶ 11.d.

at Ex. J ¶¶ 21-23 ("use of force"); ¶¶ 24-25 ("stops, searches, and seizures"); ¶¶ 28-63 ("internal affairs").  The City was found to be in substantial compliance with the Consent Decree as early as April 2003.  Hence, other than making conclusory allegations that Steubenville failed to supervise or train its officers, Plaintiffs have indicated no evidence that the City was "deliberately indifferent" to the need for relevant training.  Further, there is no evidence that the City's alleged failure to train its police officers resulted in a deprivation of Plaintiffs' constitutional rights in this case.  Thus, Defendants' Motion for Summary Judgment as to count six is **GRANTED**.

**V. CONCLUSION**

For the foregoing reasons, Defendants' Motion to Strike is **GRANTED** and Defendants' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.  The Court **GRANTS** Defendants' Motion for Summary Judgment as to counts two, four, five and six, and **DENIES** Defendants' Motion as to counts one and three.

**IT IS SO ORDERED.**

                   **s/Algenon L. Marbley**
                  **ALGENON L. MARBLEY**
                  **UNITED STATES DISTRICT JUDGE**

**DATED: November 28, 2006**